## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| RAMONA RAMOS AND ROBERTO JIMENEZ ALEX JIMENEZ JR. and LETSI JIMENEZ; <br><br> Plaintiffs, <br><br> v. <br><br> MENONNITE GENERAL HOSPITAL INC. d.b.a MENONNITE HOSPITAL CAYEY,  THE MEDICAL PROTECTIVE COMPANY, DR. YARITZA SUAREZ RODRIGUEZ; DR.ALEJANDRO MARMOLEJO  MORALES; SINDICATO DE ASEGURADORES PARA LA SUSCRIPCIÓN CONJUNTA DEL SEGURO DE RESPONSABILIDAD PROFESIONAL MÉDICO-HOSPITALARIA ("SIMED"), PUERTO RICO MEDICAL DEFENSE INSURANCE COMPANY ("PRMD"), ABC INSURANCE COMPANIES, JOHN DOE AND JAMES ROE <br><br> Defendants. | CIVIL NO.: 23-1345 <br><br> RE: TORT ACTION FOR MEDICAL MALPRACTICE PURSUANT TO ARTS. 1536 AND 1541, 31 P. R. Laws Ann.  §§ 1080 AND 10806 <br><br> JURY TRIAL DEMANDED |

## **COMPLAINT**

**TO THE HONORABLE COURT:**

**APPEAR NOW** the Plaintiffs in this action, through the undersigned attorneys, and respectfully state, allege and request as follows:

### **JURISDICTIONAL BASIS & VENUE**

1. Plaintiffs **RAMONA RAMOS, ROBERTO JIMENEZ, ALEX JIMENEZ JR.** and **LETSI JIMENEZ** are citizens of, domiciled in, and reside in the state of Connecticut.

2.  Defendants are citizens of, domiciled in, incorporated in or with their principle place of business in Puerto Rico or a state other than Connecticut.

3.  The matter in controversy exceeds the sum of Seventy Five Thousand Dollars ($75,000), exclusive of interest and costs, vesting jurisdiction on this Honorable Court pursuant to 28 U.S.C. § 1332.

4.  Venue is proper in the District of Puerto Rico pursuant to 28 U.S.C. §1391 since the events or omissions giving rise to this claim occurred in this district.

## THE PARTIES

5.  Plaintiffs **RAMONA RAMOS AND ROBERTO JIMENEZ** are the mother and  father, respectively, of son of Alex O. Jimenez Ramos, hereinafter "Alex" or "patient".

6.  Plaintiff **ALEX JIMENEZ JR**. is the son of Alex O. Jimenez Ramos

7.  Plaintiff **LETSI JIMENEZ RAMOS** is the sister of patient Alex O. Jimenez Ramos.

8.  Co-Defendant **MENONNITE GENERAL HOSPITAL INC. d.b.a MENONNITE HOSPITAL CAYEY** (hereinafter "**MHC**" or "hospital"), is a corporation duly incorporated and registered in and with its principal place of business in Puerto Rico.

9.  Co-Defendant **MHC** owns and/or operates a hospital located in Cayey, Puerto Rico, wherein it provides its patients with a gamut of hospital services and/or hospital care either directly or by way of subcontracting, these include: emergency, radiology, internal medicine, nephrology, ICU, laboratory, nursing and other hospital care and services.

10. Co-Defendant **DR. YARITZA SUAREZ RODRIGUEZ**, was Alex's first emergency room physician, while he was hospitalized at **MHC** on November 28-29, 2022.

11. Co-Defendant **DR. ALEJANDRO MARMOLEJO  MORALES**, was the second emergency room physician, that took over Alex's care after Dr. Suarez.

12. **THE MEDICAL PROTECTIVE COMPANY** is an entity organized or operating under the laws of the Commonwealth of Puerto Rico, authorized to do its business in Puerto Rico, incorporated and with its principal place of business in P.R. or state other than Connecticut, which issued insurance policy on behalf of MHC for the acts or omissions described herein, encompassing the relevant period of time.

13. On information and belief, co-Defendant **PUERTO RICO MEDICAL DEFENSE INSURANCE (**hereinafter **"PRMD"**) is an entity organized or operating under the laws of the Commonwealth of Puerto Rico, with its principal place of business in Puerto Rico, which issued insurance policies on behalf of one or more Co-Defendants for the acts or omissions described herein, encompassing the relevant period of time.

14. On information and belief, co-Defendant **SINDICATO DE ASEGURADORES PARA LA SUSCRIPCIÓN CONJUNTA DEL SEGURO DE RESPONSABILIDAD PROFESIONAL MÉDICO-HOSPITALARIA** (hereinafter "**SIMED**") is an entity organized or operating under the laws of the Commonwealth of Puerto Rico, with its principal place of business in Puerto Rico, which issued insurance policies on behalf of one or more Co-Defendants for the acts or omissions described herein, encompassing the relevant period of time.

15. Co-Defendants **ABC INSURANCE COMPANIES** are entities or corporations organized or operating under the laws of the Commonwealth of Puerto Rico, with their principal place of business in Puerto Rico or in a state other than Connecticut, which issued insurance policies on behalf of one or more Co-Defendants for the acts or omissions described herein, encompassing the relevant period of time.

16. Co-Defendants unknown joint tortfeasors **JOHN DOE** and **JAMES ROE** are physicians or other health care providers fictitiously named herein, to be later replaced by their actual names which may become known through further discovery in this litigation and who may be liable to Plaintiffs for the damages suffered, in whole or in part, for the actions and/or omissions herein described, encompassing the relevant period of time.

## GENERAL ALLEGATIONS

17. On the early afternoon of November 28, 2022 Mr. Alex Onell Jimenez Ramos (herein after "Alex" "Alex Jimenez", or "the patient") arrived at Cayey Mennonite General Hospital.

18. Alex was put on a waiting list and had to wait for hours to be triaged.

19. Alex was vomiting while he waited to be triaged.

20. It is recorded that at 5:34 p.m while in the emergency department he was complaining of severe abdominal pain.

21. The chief complaint was recorded as abdominal pain on the left side since that morning and the patient took acetaminophen to relieve the pain.

22. The pain was described in the  record as severe in intensity, burning in character, crushing, and radiating.

23. Alex was assisted by the Triage nurse who recorded the vital signs.

24. Alex's vital signs were showing diastolic hypotension, tachycardia, and oxygen desaturation, all compatible with shock and respiratory dysfunction.

25. The triage nurse negligently failed to recognize the abnormal vital signs compatible with life-threatening conditions and thus did not categorize him for immediate medical intervention.

26. After the triage, there was an undue delay of more than an hour before Alex was first seen by the ER doctor.

27. At 6:42 p.m., the patient was evaluated by the emergency physician, Dr. Yaritza Suarez Rodriguez who obtained the history from the patient who was alert, oriented, cooperative without limitations and with normal breathing pattern.

28. The history of present illness was recorded as a 42-year-old male who developed an abdominal pain in the left lower area and fever since that day.

29. The pertinent review of systems findings were abdominal pain and fever.

30. The abdominal physical examination revealed tenderness in the left lower quadrant with guarding.

31. A guarding sign is a sign compatible with peritonitis.

32. Dr. Suarez admitted Alex to the ER observation area and ordered the ordinary laboratory tests, IV fluids at a rate of 50 ml/hr., and a CT scan of the abdomen without contrasts.

33. According the medical record Dr. Suarez ordered morphine and Toradol®.

34. Despite these analgesics, Alex continued having excruciating pain as his mother, Ramona, witnessed.

35. Dr. Suarez ordered most of the laboratory tests and image studies were requested to be done as urgent and stat (immediately).

36. Despite the immediate request for an urgent abdominal CT, it took more than 4 hours until it was read and reported.

37. At 11:14 p.m., the radiologist, Dr. Juan E. Perez Monte, interpreted the CT scan of the abdomen as an umbilical hernia with a small bowel loop measuring approximately 2.2 cm in the anteroposterior dimension and 2.4 cm in the transverse dimension.

38. Radiologist Dr. Perez recorded a possible small bowel obstruction and called Dr. Suarez to notify the important findings and recommended a surgical consultation and follow-up.

39. Dr. Suarez never placed a surgery consult.

40. The lactic acid test ordered by Dr. Suarez on November 28, 2022 at 11:05 pm, was collected at 1:56 pm, received by laboratory at 2:52 pm and results reported as panic values to nurse Nogueras at 5:04 am on November 29, 2022.

41. The nurses did not collect blood samples for lactic acid test for more than two hours after ordered and the results were not available for almost six (6) hours after ordered by Dr. Suarez.

42. At 11:26 p.m., the nurse recorded a blood pressure of 70/48 mmHg.

43. The nurse notified Dr. Suarez of the low blood pressure, who then ordered an increase in the IV fluids infusion rate to 125 ml/hour and ordered supplemental oxygen.

44. The oxygen saturation (SpO2) at that time was 80%.

45. Low oxygen saturation can cause damage to heart and the brain.

46. According to the medical record, at 11:50 p.m., Dr. Suarez  was aware of these abnormal tests results and even recorded the results of the chemistry tests.

47. The hemogram results were still pending at that time because the blood sample for the hemogram was collected at 8:55 p.m., received at the clinical laboratory at 10:23 p.m., and processed at 12:08 a.m. on November 29, 2022

48. Dr. Suarez recorded that she reviewed the radiologic study results and concluded that the patient was stable, was hemodynamically stable and all vital signs were normal.

49. Dr. Suarez recorded another physical examination indicating that the abdomen was soft with mild tenderness and normal bowel sounds.

50. Ramona was present for the only physical examination of Alex by Dr. Suarez.

51. During this one and only physical evaluation, Ramona witnessed that Alex nearly jumped out of his skin due to the excruciating pain he experienced when Dr. Suarez pressed down on Alex's abdomen.

52. At no point during Alex's hospitalization, was he ever re-examined by any emergency room doctor.

53. The emergency room doctors were absent from Alex's presence, relying on nurses' monitoring.

54. The medical record reflects that the emergency room nurses were not monitoring Alex's condition while at the emergency department.

55. The medical record lacks periodic nursing assessments of Alex by the emergency room nurses.

56. When the emergency room nurses finally showed up, they blamed the erratic and abnormal vitals on the malfunctioning monitor.

57. Ramona would request that the nurses take the blood pressure manually or substitute the machine, but the nurses ignored her requests.

58. Dr. Suarez discussed the case with Dr. Marmolejo, next physician on duty, for further evaluation, treatment, and disposition of Alex.

59. On November 29, 2022, at 12:54 a.m., the nurse recorded that the patient continued with low blood pressures at 70/48 mmHg.

60. Nurse notified Dr. Marmolejo who then ordered vasopressors.

61. Alex's troubling vitals continued late the night of November 28 and early that morning November 29.

62. Ramona throughout Alex's hospitalization had to repeatedly call the nurses as she watched her son's health continue to deteriorate right before her eyes.

63. At around 3:00 am a nurse struck Alex in the chest while she was performing a heart tracing, Ramona saw her sons' eyes open wide looking like they were about to explode.

64. At no point did Alex stop complaining about the excruciating abdominal pain he was experiencing; it simply never went away.

65. According to the medical record, at 4:52 a.m., the emergency physician, Dr. Alejandro Marmolejo Morales, reevaluated Mr. Alex Jimenez and recorded no abdominal pain and that the patient felt much better at that time. He also stated that the vital signs were all under no critical parameters.

66. But according to Ramona who was present during the entirety of Alex's stay at MHC, Dr. Marmolejo Morales never came to see or examine her son Alex.

67. All the contrary, Ramona would desperately seek Dr. Marmolejo Morales' treatment for her son, but he remained at the computer responding that the nurses were handling Alex's care.

68. Although Dr. Marmolejo recorded a normal physical examination of the abdomen, he consulted internal medicine Dr. Brian A. Santiago Diaz for abdominal pain.

69. The lactic acid test ordered by Dr. Suarez on November 28, 2022, at 11:05 p.m. was collected at 1:56 a.m., received at the laboratory at 2:52 a.m. and the results reported as panic values of 12.9 mmol/L to the nurse Nogueras at 5:04 a.m. on November 29, 2022.

70. At 6:43 a.m., another panic value of lactate was notified to nurse Andujar. This time the test resulted in 9.4 mmol/L and was notified again to Dr. Marmolejo.

71. Despite the lactate panic value and continued hypotension recorded, Dr. Marmolejo did not order any additional treatment.

72. At 7:00 a.m., the nurse recorded a blood pressure of 79/44 mmHg, and that the patient was waiting for the internist evaluation.

73. Alex for hours had been exhibiting extreme abdominal pain, hypotension, hypoxemia and alarming lactate levels.

74. Alex developed irregular cardiac rhythm and labored Breathing.

75. At 9:30 a.m., the internal medicine consultation was answered by Dr. Armando M. Alvarez Yulfo..

76. Dr. Alvarez concluded that Alex Jimenez had a possible fluid overload, bronchopneumonia, incarcerated umbilical hernia and small bowel obstruction.

77. Dr. Alvarez found the patient was critically ill and ordered his admission to the intensive care unit (ICU) for close monitoring and management.

78. Dr. Alvarez ordered bacteriologic cultures, empiric antibiotherapy, a nasogastric tube connected to intermittent suction and vasopressors to elevate the blood pressure.

79. Dr. Alvarez placed a surgery consult for small bowel obstruction.

80. At 9:35 a.m., a green code was called for a cardiorespiratory arrest which was answered by the emergency physician, Dr. Victor M. Hernandez Flores who began ACLS measures, intubated the patient, and connected him to a mechanical ventilator.

81. At 11:25 a.m., the patient developed another cardiorespiratory arrest which was answeredby Dr. Hernández who began ACLS protocol and after 11 minutes, the patient recovered pulse.

82. At 12:55 p.m., the patient had a third cardiac arrest and was assisted by Dr. Hernández but the patient did not respond and was pronounced dead at 1:20 p.m.

83. The chest radiograph was compatible with pneumonia and patient Alex Jimenez had clinical sepsis in state of shock.

84. Many hours later at 6:23 p.m., the surgeon, Dr. Esteban Martinez Lugo went to evaluate Alex Jimenez and noticed that he had passed away.

85. As a direct result of Defendants' negligence and failure to properly provide Alex with adequate hospital treatment by medical, nursing care and staff, Plaintiffs have lost their son, father and brother, respectively.

86. As a direct result of Defendants' negligence and failure to properly provide Alex with adequate medical and nursing care, Alex died at only 42 years old.

87. Plaintiffs have suffered much pain and suffering, emotional and mental damages as a direct result of Defendants' negligence and/or the negligence of their employees, agents, or assignees.

**FIRST CAUSE OF ACTION FOR NEGLIGENCE UNDER ARTICLES 1536 & 1541 OF THE PUERTO RICO CIVIL CODE AND CORPORATE RESPONSIBILITY AGAINST MHC AND ITS PERSONNEL**

88. The allegations contained above are incorporated by reference as if again fully set forth herein.

89. Defendant **MHC** provides emergency, nursing, and medical care to all types of patients, including patients such as Alex.

90. Defendant **MHC**, at the relevant times of this Complaint, provided emergency, nursing and medical treatment to Alex while he was admitted on November 28-29, 2022.

91. Defendant **MHC** contracted, employed, provided privileges or arranged for **YARITZA SUAREZ RODRIGUEZ** and **DR. ALEJANDRO MARMOLEJO MORALES** to be Alex's emergency room physician, as per established hospital protocol, contracts and/or bylaws.

92. Defendant **MHC** has established policies, procedures and/or requirements for the provision of the nursing and medical treatment for patients with symptoms of abdominal pain, such as Alex.

93. Defendant **MHC** provided nursing care that was below standard in providing adequate monitoring to the patient and reporting it to the medical staff as well as taking appropriate action to prevent further deterioration by the patient.

94. Defendant **MHC** provided nursing care that was below standard in timely carrying out medical orders, timely taking patient for radiological studies, timely taking blood and urine and other samples for immediate testing and notifying the results.

95. Defendant **MHC** provided an inefficient and underperforming hospital organizational structure fraught with delays and miscommunication that caused Alex to receive substandard nursing and medical care.

96. Defendant **MHC** provided deficient services through its emergency department, laboratory, radiology department, and physician consultation procedures, all contributing to the substandard medical and nursing care.

97. Defendant **MHC** supplies doctors, nurses, therapists, clerical, administrative, emergency and technical personnel to treat patients such as Alex.

98. Defendant **MHC** derives revenue from the services it provides it patients.

99. Defendant **MHC's** established policies, procedures and/or requirements for the proper and prompt triage, examination, testing, evaluation, consultation among others, for patients such as Alex.

100. Defendant **MHC**'s triage nurses failed to recognize that Alex's vital signs were compatible with life-threatening conditions and did not categorize him accordingly.

101. Defendant **MHC**'s nurses were not adequately monitoring Alex and had to be called continuously by Ramona to check her son's condition.

102. Defendant **MHC**'s nurses were not fully aware of Alex's conditions and the type of care he required despite these being documented in the medical record.

103. Defendant **MHC's** established policies, procedures and/or requirements for the provision of timely consults with specialists such as surgeons and internists for patients in dire need, such as Alex.

104. Alex's severe abdominal pain caused by the bowel obstruction and sepsis and/or other conditions were mishandled to the point they caused his demise.

105. Defendant **MHC** is liable for medical/nursing malpractice caused by the personnel it hires to provide services to its patients.

106. Defendant **MHC** owed a duty to Plaintiffs to provide emergency room personnel, nurses, doctors, facilities, staffing, treatment, physicans with privileges and medical care consistent with the medical standards that satisfy the exigencies generally recognized by the medical profession in light of the modern means of communication and teaching.

107. The treatment offered by **MHC** through its personnel, nurses, employees, doctors, agents and assignees, to Alex was below the medical standard that satisfies the exigencies generally recognized by the medical profession in light of the modern means of communication and teaching, and as such directly caused and/or contributed to causing Alex's death and the injuries to Plaintiffs, as described herein.

108. Defendant **MHC**, through its personnel, nurses, employees, doctors, agents and assignees, failed to exercise the care and precautions required under the circumstances in order to prevent the damage and injuries to Plaintiffs, lacked the required knowledge and medical/nursing skill, failed to timely have available the personnel and equipment necessary to avoid the injuries to Alex and subsequent injuries to Plaintiffs.

109. Defendant **MHC**, through its personnel, nurses, employees, doctors, agents and assignees, negligently failed to adequately monitor Alex's delicate condition and ensure prompt response and intervention by medical consultants such as a surgeon.

110. Defendant **MHC**, through its personnel, nurses, employees, doctors, agents and assignees, negligently failed to timely and properly rule out or diagnose and administer proper care for the bowel obstruction resulting in sepsis in order to avoid Alex's death.

111. Defendant **MHC**, through its personnel, nurses, employees, doctors, agents and assignees, failed to ensure proper and timely physician, nursing and other medical services were made available to Alex.

112. At all times herein pertinent, Defendant **MHC**, through its executives, directors, personnel, nurses, employees, doctors, agents and assignees were negligent in failing to provide the proper medical attention to Alex, in failing to provide the proper supervision or management of defendants **DR. YARITZA SUAREZ RODRIGUEZ AND ALEJANDRO MARMOLEJO MORALES** as well as the medical and other personnel it employs, contracts, subcontracts and otherwise failing to exercise due care and caution to prevent the tortious conduct and injuries to Plaintiffs.

113. **MHC** is liable for the negligent acts or omissions of **DR. YARITZA SUAREZ RODRIGUEZ AND ALEJANDRO MARMOLEJO MORALES** that caused damage to Plaintiffs for failure to provide, disclose, or enforce proper protocols to ensure proper care, monitoring and immediate intervention by doctors of patients such as Alex.

114. **MHC** is liable for failing to adequately supervise or monitor **DR. YARITZA SUAREZ RODRIGUEZ AND ALEJANDRO MARMOLEJO MORALES** in order to prevent negligence in the treatment provided by them to Alex during his admission.

115. Defendant **MHC**, through its personnel, nurses, employees, doctors, agents and assignees, offered medical services to patients, but failed to staff its operation with the medical personnel necessary to timely, appropriately, and safely treat its patients and ensure appropriate and timely treatment.

116. In so doing, Defendant **MHC**, through its personnel, nurses, employees, doctors, agents and assignees, misled those who sought full medical treatment into thinking that they would be appropriately treated.

117. **MHC** failed in its corporate duty under the doctrine of corporate responsibility to look out for the health of Alex, guarantee his safety and well being while hospitalized,

including but not limited to carefully selecting the physicians that are granted privileges to practice at its institution, requiring that such physicians take courses and are current, monitoring the work of such physicians and intervening when they commit acts of malpractice, discontinuing their privileges for repeated or crass negligence and ensuring they are up to date with technological advances.

118. As a direct and proximate cause of Defendant **MHC's** acts or omissions, through its personnel, nurses, employees, doctors, agents and assignees, including its failure to properly treat Alex, Plaintiffs lost their father, son and brother and sustained damages, including mental, and emotional pain and suffering and associated damages, as described below.

**SECOND CAUSE OF ACTION FOR NEGLIGENCE UNDER ARTICLES 1536 & 1541 OF THE PUERTO RICO CIVIL CODE AGAINST DR. YARITZA SUAREZ RODRIGUEZ**

119. The allegations contained above are incorporated by reference as if again fully set forth herein.

120. At the time of the incident giving rise to this Complaint, Defendant **DR. YARITZA SUAREZ RODRIGUEZ** was the emergency room physician assigned by **MHC** to treat Alex while he was treated at MHC.

121. Defendant **DR. YARITZA SUAREZ RODRIGUEZ** owed a duty to Alex and to Plaintiffs to provide medical care and treatment consistent with the medical standards that satisfy the exigencies generally recognized by the medical profession in light of the modern means of communication and teaching.

122. Defendant **DR. YARITZA SUAREZ RODRIGUEZ's** treatment of Alex was below the medical standard that satisfies the exigencies generally recognized by the medical profession in light of the modern means of communication and teaching, and as such directly caused and/or contributed to causing Plaintiffs the injuries as described herein.

123. Defendant **DR. YARITZA SUAREZ RODRIGUEZ** negligently and carelessly failed to provide Alex with prompt medical attention, follow up of her medical orders, follow up on nursing care, close monitoring and properly addressing and effectively treating Alex's hypotension, tachycardia and oxygen desaturation.

124. Defendant **DR. YARITZA SUAREZ RODRIGUEZ** negligently and carelessly failed to properly, timely address and treat the serious clinical symptoms and laboratory results which demonstrated he was unstable and needed immediate and aggressive medical intervention.

125. Defendant **DR. YARITZA SUAREZ RODRIGUEZ** negligently and carelessly failed to provide Alex with the necessary examinations, testing, evaluations, and other medical care including addressing the intestinal obstruction, fever, sepsis and unstable vital signs properly.

126. Defendant **DR. YARITZA SUAREZ RODRIGUEZ** negligently and carelessly lost valuable time in addressing his patient Alex's obvious danger signs and symptoms, when he could have averted Alex's death with prompt and decisive intervention.

127. Defendant **DR. YARITZA SUAREZ RODRIGUEZ** negligently and carelessly failed to obtain an immediate surgical consult and intervention after the radiologist personally communicated via telephone his alarming radiological findings and recommended surgical consultation.

128. Defendant **DR. YARITZA SUAREZ RODRIGUEZ** negligently and carelessly failed to properly and timely transfer Alex to intensive care unit for proper monitoring and care.

129. Defendant **DR. YARITZA SUAREZ RODRIGUEZ,** instead, improperly classified Alex as stable and merely passed along Alex to the next emergency physician without alerting her successor to the impending and untreated abdominal catastrophe and eventual multiorgan failure.

130. Defendant **DR. YARITZA SUAREZ RODRIGUEZ** failed to properly, timely address and treat the abrupt change in Alex's vital signs.

131. Defendant **DR. YARITZA SUAREZ RODRIGUEZ** failed to properly address and treat Alex's excruciating abdominal pain, hypotension, hypoxia and breathing difficulties.

132. In so doing, Defendants **DR. YARITZA SUAREZ RODRIGUEZ** committed professional negligence, including lack of expertise, fault and malpractice, which directly and proximately caused the injuries and damages suffered by Plaintiffs as a result of the death of Alex, as detailed herein.

133. As a direct and proximate cause of Defendants **DR. YARITZA SUAREZ RODRIGUEZ**'s acts or omissions, Plaintiffs sustained damages as described below.

**THIRD CAUSE OF ACTION FOR NEGLIGENCE UNDER ARTICLES 1536 & 1541 OF THE PUERTO RICO CIVIL CODE AGAINST DR. ALEJANDRO MARMOLEJO MORALES**

134. The allegations contained above are incorporated by reference as if again fully set forth herein.

135. At the time of the incidents giving rise to this Complaint, Defendant **DR. ALEJANDRO MARMOLEJO MORALES** was a physician assigned by **MHC** to treat Alex during his admission at MHC.

136. Defendant **DR. ALEJANDRO MARMOLEJO MORALES** owed a duty to Alex and to Plaintiffs to provide medical care and treatment consistent with the medical standards that satisfy the exigencies generally recognized by the medical profession in light of the modern means of communication and teaching.

137. Defendants **DR. ALEJANDRO MARMOLEJO MORALES's** treatment of Alex was below the medical standard that satisfies the exigencies generally recognized by the medical profession in light of the modern means of communication and teaching, and as such directly caused and/or contributed to causing Plaintiffs the injuries as described herein.

138. Defendant **DR. ALEJANDRO MARMOLEJO MORALES** negligently and carelessly failed to provide Alex with prompt medical attention, follow up of the medical orders, follow up on nursing care, close monitoring and properly addressing and effectively treating Alex's hypotension, tachycardia and oxygen desaturation.

139. Defendant **DR. ALEJANDRO MARMOLEJO MORALES** negligently and carelessly failed to properly, timely address and treat the serious clinical symptoms and laboratory results which demonstrated he was unstable and needed immediate and aggressive medical intervention.

140. Defendant **DR. ALEJANDRO MARMOLEJO MORALES** negligently and carelessly categorized Alex as stable, contrary to the clinical signs, vital signs, oxygenation and laboratory, radiology results demonstrating Alex had an intra-abdominal process that

required immediate aggressive medical treatment, immediate surgical intervention and close monitoring to prevent his deteriorating condition.

141. Defendant **DR. ALEJANDRO MARMOLEJO MORALES** negligently and carelessly lost valuable time in addressing his patient Alex's obvious danger signs and symptoms, when he could have averted Alex's death with prompt and decisive intervention.

142. Defendant **DR. ALEJANDRO MARMOLEJO MORALES** negligently and carelessly failed to properly and timely transfer Alex to intensive care unit for proper monitoring and care.

143. Defendant **DR. ALEJANDRO MARMOLEJO MORALES** negligently and carelessly failed to provide Alex with the necessary examinations, testing, evaluations, and medical care, including ruling out and/or treating the impending abdominal catastrophe and consequential multiorgan failure.

144. Defendants **DR. ALEJANDRO MARMOLEJO MORALES** failed to exercise reasonable care and skill commensurate with the standard of care practiced in the medical profession at that time and under like and similar circumstances when he failed to implement aggressive treatment and very close monitoring for Alex's condition.

145. In so doing, Defendant **DR. ALEJANDRO MARMOLEJO MORALES** committed professional negligence, including lack of expertise, errors of commission or omission, fault and malpractice, which directly and proximately caused the injuries and damages suffered by Plaintiffs, particularly for the death of Alex, as detailed herein.

**FOURTH CAUSE OF ACTION AGAINST SIMED**

146. The allegations contained above are incorporated by reference as if again fully set forth herein.

147. Co-Defendant **SIMED** was at all times herein pertinent an insurance company authorized to do business in the Commonwealth of Puerto Rico and which issued a public liability and/or malpractice insurance policy and/or other applicable insurance on behalf of one or more Defendants and/or other unknown joint tortfeasors.

148. Pursuant to 26 P.R. Laws Ann. § 2001, an insurance company is liable for the negligence or fault of its insured.

149. Pursuant to 26 P.R. Laws Ann. § 2003, an action against an insurer may be brought separately or may be joined together with an action against its insured.

## FIFTH CAUSE OF ACTION AGAINST PRMD

150. The allegations contained above are incorporated herein by reference as if again fully set forth.

151. Defendant **PRMD** was, at all times herein pertinent, an insurance company authorized to do business as such in the Commonwealth of Puerto Rico which issued a public liability and/or malpractice insurance policy and/or other applicable insurance on behalf of one or more Defendants and/or other unknown joint tortfeasors.

152. Pursuant to 26 P.R. Laws Ann. § 2001, an insurance company is liable for the negligence or fault of its insured.

153. Pursuant to 26 P.R. Laws Ann. § 2003, an action against an insurer may be brought separately or may be joined together with an action against its insured.

## SIXTH CAUSE OF ACTION AGAINST THE MEDICAL PROTECTIVE COMPANY

154. The allegations contained above are incorporated herein by reference as if again fully set forth.

155. Defendant **THE MEDICAL PROTECTIVE COMPANY** was, at all times herein pertinent, an insurance company authorized to do business as such in the Commonwealth of Puerto Rico which issued a public liability and/or malpractice insurance policy and/or other applicable insurance on behalf of one or more Defendants and/or other unknown joint tortfeasors.

156. Pursuant to 26 P.R. Laws Ann. § 2001, an insurance company is liable for the negligence or fault of its insured.

157. Pursuant to 26 P.R. Laws Ann. § 2003, an action against an insurer may be brought separately or may be joined together with an action against its insured.

## SEVENTH CAUSE OF ACTION AGAINST ABC INSURANCE COMPANIES

158. The allegations contained above are incorporated herein by reference as if again fully set forth.

159. Co-Defendants **ABC INSURANCE COMPANIES** are fictitiously named insurance companies so designated for lack of knowledge at this point in the proceedings.

160. Co-Defendants **ABC INSURANCE COMPANIES** were, at all times herein pertinent, insurance companies authorized to do business as such in the Commonwealth of Puerto Rico which issued a public liability and/or malpractice insurance policy and/or other applicable insurance on behalf of Defendants and/or other unknown joint tortfeasors.

161. Pursuant to 26 P.R. Laws Ann. § 2001, an insurance company is liable for the negligence or fault of its insured.

162. Pursuant to 26 P.R. Laws Ann. § 2003, an action against an insurer may be brought separately or may be joined together with an action against its insured.

**EIGHTH CAUSE OF ACTION FOR NEGLIGENCE UNDER ARTICLES 1536 & 1541 OF THE PUERTO RICO CIVIL CODE AGAINST JOHN DOE AND JAMES ROE UNKNOWN JOINT TORTFEASORS**

163. The allegations contained above are incorporated by reference as if again fully set forth herein.

164. Co-Defendants John Doe and James Roe are so designated for lack of knowledge at this point in the proceedings.

165. Co-Defendants John Doe and James Roe's intervention in the nursing, technical or medical care of Alex while at MHC was below the nursing, technical and medical standard that satisfies the exigencies generally recognized by the medical profession in light of the modern means of communication and teaching and, as such, directly caused and/or contributed to causing Alex's death and, thus, the pain and suffering of Plaintiffs upon his premature death, as described herein.

166. Co-Defendants John Doe and James Roe negligently and carelessly, breaching the medical standard that satisfies the exigencies generally recognized by the medical profession in light of the modern means of communication and teaching, failed to perform a complete, thorough medical examination of Alex commensurate with his condition as such, directly caused and/or contributed to causing his premature death and the emotional pain and suffering such death caused upon the Plaintiffs.

167. Co-Defendants John Doe and James Roe negligently and carelessly failed to exercise reasonable care and skill commensurate with the standard of care practiced in the medical profession at that time and under like and similar circumstances when they failed to correctly and promptly recognize and treat the patient's symptoms and condition and,

thus, failed to provide a prompt, complete, thorough and adequate evaluation and treatment.

168. Co-Defendants John Doe and James Roe negligently and carelessly failed to promptly examine, evaluate and treat Alex's symptoms, thus denying him the provision of essential and life-saving treatment.

169. Co-Defendants John Doe and James Roe failed to exercise reasonable care and skill commensurate with the standard of care practiced in the medical profession at that time and under like and similar circumstances when they failed to provide Alex with appropriate treatment.

170. As a direct and proximate cause of Co-Defendants John Doe and James Roe's negligent actions and omissions upon being presented with a patient in Alex's condition and with his clinical signs, Alex was deprived of the opportunity to be promptly treated when time was of the essence and the Plaintiffs, through the premature death of Alex were deprived of his companionship, camaraderie, support and love, as detailed herein.

**DAMAGES**

171. The allegations contained above are incorporated herein by reference as if again fully set forth.

172. As a direct and proximate result of the acts or omissions of all Co-Defendants, Alex died prematurely at the age of 42, leaving his adult son behind.

173. As a result of the professional negligence, lack of expertise, fault, and malpractice of all Co-Defendants, Plaintiffs unnecessarily and prematurely lost their son, father, and brother Alex, a beloved and caring person.

174. As a result of the professional negligence, lack of expertise, fault, and malpractice of all Co-Defendants, Plaintiffs' quality of life has been severely impaired.

175. As a result of the professional negligence, lack of expertise, fault, and malpractice of all Co-Defendants, Plaintiffs experience the extraordinary pain and suffering knowing their beloved father, son and brother died a painful and untimely death, knowing that it was avoidable.

176. In losing Alex, Plaintiffs lost their beloved son, father, and brother.

177. Plaintiffs have suffered dearly the loss of Alex, with whom they will not be able to share the special moments in their lives.

178. As a direct and proximate result of the negligence of all Defendants, Plaintiffs will no longer have the joy of having Alex with them, or otherwise enjoy the irreplaceable pleasures and value of his company and advice.

179. Plaintiffs were a close-knit family and Alex's death has left a void in their lives.

180. Ramona and Roberto's holidays in Puerto Rico with their son Alex were ruined with his unexpected death as a result of the medical malpractice Alex experienced at MHC.

181. Letsi's holidays in Puerto Rico were also ruined since she was going to meet with her brother Alex and their parents Ramona and Roberto in Puerto Rico, but Alex passed away unexpectedly before her arrival.

182. Plaintiffs lost Alex on his birthday and as a result were unable to celebrate the day with him.

183. Ramona sang happy birthday to her son Alex in tears while he was in pain and suffering from lack of proper treatment at MHC.

184. As a direct and proximate result of the negligence of all Defendants, Plaintiffs will continue to suffer the irreparable loss of Alex.

185. Plaintiffs are still coping with the death of Alex and their lives will never be the same.

186. Plaintiffs feel frustrated and are very affected by Alex's unexpected death at MHC.

187. The negligent acts and omissions of the Defendants have directly and proximately caused Plaintiff **RAMONA RAMOS, Alex's mother,** intense emotional and mental pain and suffering, frustration and a grave sense of injustice, especially since she witnessed the mistreatment, callousness and malpractice experienced by Alex at MHC, which is valued in an amount of no less than **ONE MILLION  DOLLARS ($1,000,000.00).**

188. The negligent acts and omissions of the Defendants have directly and proximately caused Plaintiff **ROBERTO JIMENEZ, Alex's father,** intense emotional and mental pain and suffering, frustration and a grave sense of injustice valued in an amount of no less than **ONE MILLION  DOLLARS ($1,000,000.00).**

189. The negligent acts and omissions of the Defendants have directly and proximately caused Plaintiff **ALEX JIMENEZ JR., Alex's son,** intense emotional and mental pain and suffering, frustration and a grave sense of injustice valued in an amount of no less than **ONE MILLION  DOLLARS ($1,000,000.00).**

190. The negligent acts and omissions of the Defendants have directly and proximately caused Plaintiff **LETSI JIMENEZ, Alex's sister** intense emotional and mental pain and suffering, frustration and a grave sense of injustice valued in an amount of no less than **ONE MILLION  DOLLARS ($1,000,000.00).**

191. In total, the damages suffered by Plaintiffs have a reasonable value in excess of **FOUR MILLION  DOLLARS ($4,000,000).**

**TRIAL BY JURY DEMANDED**

192. Plaintiffs demand trial by jury on all causes of action herein raised.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against all Defendants jointly and severally, in an amount not less than **FOUR MILLION DOLLARS ($4,000,000)**, as well as costs incurred, reasonable attorneys' fees, and such other and further relief as this Honorable Court may seem just and proper under the law.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, on this  30th day of June, 2023.

> **INDIANO & WILLIAMS, P.S.C.**
> 207 del Parque Street; 3rd Floor
> San Juan, P.R. 00912
> Tel: (787) 641-4545;
> Fax: (787) 641-4544
> jeffrey.williams@indianowilliams.com
> vanesa.vicens@indianowilliams.com
> joanne.pimentel@indianowilliams.com
>
>
> s/ Jeffrey Williams
> JEFFREY M. WILLIAMS
> USDC PR Bar No. 202104
>
>
> s/Vanesa Vicéns Sanchez
> VANESA VICENS SANCHEZ
> USDC PR Bar No. 217807
>
>
> *s/Joanne Pimentel de Jesús*
> JOANNE PIMENTEL DE JESÚS
> USDC PR Bar No. 309005